Denny v. Faulkner.

---

Wm. A. Denny, *et al.*, v. Hedwig Faulkner, *Administratrix, &c.*

1. Motion for New Trial; *Continuance of Hearing; Exceptions.* Where a case was tried at one term before a jury, verdict returned, and a motion for a new trial duly filed, and such motion was continued to a subsequent term, and then upon hearing overruled and time given in which to make a case, *held,* that the exceptions to the proceedings on the trial, though first reduced to writing at the time of making the case and after the close of the trial term, were in time, and must be considered in this court.

2. Bill of Sale, *Construed.* A bill of sale executed in Illinois upon personal property situated in Nebraska, is valid *inter. partes,* though intended only as security for advances, and though neither filed nor recorded in Illinois or Nebraska, and though possession of the property was not delivered.

3. —————— *Rights of Administratrix under Bill of Sale.* An administratrix of the vendor in such a bill of sale has no greater rights in said property than her intestate, and can make no other defenses than he against such bill of sale.

4. Administration; *Domicil; Jurisdiction.* Where F., domiciled in Nebraska, dies, leaving personal property in Kansas, and administration is duly taken out at the place of his domicil, and the administratrix so

appointed takes peaceable possession of such property in Kansas, and there is no opposing administration in this state, and no local creditors, *held*, that the courts of this state will, *ex comitate*, recognize her possession as rightful, and protect it as fully as though she had taken out letters of administration in this state.

5. JURISDICTION; *Void Levy of Process; Valid Levy.* Where a sheriff of one of the counties of Nebraska, with process issued by a Nebraska court, comes into this state and levies upon personal property within the limits of this state, such levy is absolutely void, and confers no title or right of possession upon such sheriff; but where such sheriff with such process levies upon property within the limits of his jurisdiction, he establishes a title and right of possession which will be recognized and protected in the courts of this state, although while holding such possession he temporarily moves such property into this state, and while in this state it is seized upon process issued out of a court of this state.

6. COMITY; *Lex Loci Contractus; Lex Fori.* While it is a general proposition that, as to contracts concerning personal property, the *lex loci contractus* governs, or in other words, that whatever goes to the form, manner of execution, and all other matters affecting the validity of the instrument as a contract *inter partes*, is settled by the law of the state where the contract is entered into, yet, where such contract is made concerning personal property situated in another state, the latter may, without violating any of the obligations of comity, uphold its own laws concerning the effect of such a contract upon the rights of third parties domiciled within such state.

7. CHATTEL MORTGAGE; *Duties and Liability of Mortgagee.* If a chattel mortgagee in this state takes possession of the property mortgaged, and in good faith, according to the statute, advertises and sells the property, he is responsible to the mortgagor for only the surplus of the proceeds of such sale above the debt, interest and costs; but if he make other disposition, he is responsible for the difference between the actual cash value at the time and place of taking possession and the amount of the debt and interest.

8. ———— In enforcing remedies, the *lex fori* governs.

## *Error from Brown District Court.*

REPLEVIN begun by *William A. Denny* and *William T. Redman*, as partners, against *Hedwig Faulkner*, administratrix of the estate of O. P. Faulkner, deceased, and three other defendants, to recover the possession of certain cattle. Trial before a jury, at the April Term, 1875, of the district court, and verdict for defendant *Faulkner*. The plaintiffs duly filed a motion for a new trial, but the hearing thereof was con-

tinued until the April Term, 1876, when it was overruled, and judgment rendered for defendant and against the plaintiffs, who bring the case here. The facts sufficiently appear in the opinion.

*W. W. Guthrie,* and *A. Perry,* for plaintiffs in error.

*Nathan Price,* and *August Schonenheit,* for defendant in error.

The opinion of the court was delivered by

BREWER, J.: Plaintiffs in error (plaintiffs below) commenced an action of replevin to recover the possession of certain cattle. Judgment was rendered against them in the district court for the value of the cattle, and they prosecute this proceeding in error to review such judgment.

A preliminary question is raised on the record, and counsel for defendants claim that it is not in such a condition that we can examine the alleged errors. It appears that the case was tried before a jury, at the April term, 1875, and verdict returned. A motion for a new trial was duly filed, but the hearing thereof was continued until the April term, 1876, at which time it was overruled and time given to make a case. Now it is contended that the exceptions taken to the rulings at the trial must be reduced to writing at the term; that the continuance of the motion for a new trial does not continue the right to reduce the exceptions to writing; and that no exceptions having been reduced to writing during the term, no subsequent reduction of the exceptions to writing is of any validity. (*Kline v. Wynne,* 10 Ohio St. 223; *Morgan v. Boyd,* 13 Ohio St. 271.) Whatever might be true if the case stood upon a bill of exceptions (and unless we departed from the Ohio decisions we should be compelled to hold such a bill of exceptions of no validity), we think our statutes warrant a case-made with exceptions reduced to writing after the close of a term. There is no inherent vice in so reducing exceptions to writing; the legislature can authorize such action, and the question is one of policy only. Until the provisions

for a case-made, the statute was clear, and compelled action during the term. The court was not authorized to further extend the time. But the court is authorized generally to extend the time for making a case. No limitation is placed in the statute. Full discretion seems to have been granted. And the case-made is not the mere collection of the pleadings and previously-prepared bills of exceptions—it is itself the statement of the proceedings and evidence, or other matters, or so much thereof as is deemed necessary to present the errors complained of. (Gen. Stat., p. 737, § 547.) It is an original document, and not a compilation. Extending the time to make it, extends the time to make it completely and wholly. It may all be done on the very last day of the extended time. The testimony and exceptions may on that day for the first time be reduced to writing. This would seem logically to follow from the provisions of the general statutes. But, as if to avoid any doubt, the legislature, in 1870, and again in 1871, amended by providing that "the exceptions stated in a case-made shall have the same effect as if they had been reduced to writing, allowed and signed by the judge at the term they were taken." (Laws 1870, p. 169, § 2; Laws 1871, p. 274, § 1.) This plainly implies that the exceptions are first reduced to writing when the case-made is prepared, and declares that they are to have the same effect as if reduced to writing at the time they were taken; and the time in which they may be so reduced to writing, is as extensive as the time for making the case. So far as the 1. Motion for new trial; continuance of hearing; exceptions. motion for a new trial is concerned, it has already been decided that it may be continued, and that the lapse of a term does not vitiate the motion or forfeit the rights of the moving party. (*Brenner v. Bigelow*, 8 Kas. 498.) We are forced therefore to an examination of the record, and the principal questions involved in it. A brief statement of the facts is necessary to a clear understanding of those questions. In the fall of 1871, the cattle in controversy belonged to O. P. Faulkner. At that time he executed the following bill of sale:

"UNION STOCK YARDS, CHICAGO, Nov. 4, 1871.

*"Know all men by these presents,* That I have this day bargained, sold and delivered to Denny & Redman, of the Union stock yards, Cook county, Ill., three hundred and seventy-five (375) Texas cattle that are now feeding on my farm in Richardson county, Nebraska. Cattle are all branded with the letter 'R.' O. P. FAULKNER."

This instrument, though in form an absolute bill of sale, was found by the jury to have been intended as only a security. It appears that Faulkner received some money thereon from Denny & Redman, and shipped some cattle to them. The balance remained in his possession, at his farm in Nebraska, until his death, in May, 1872, and are the cattle in controversy. No filing or record was made of this bill of sale in Illinois, Nebraska or Kansas. May 31, 1872, O. P. Faulkner died, and on June 10th, Hedwig Faulkner, his widow, was appointed administratrix by the probate court of Richardson county, Nebraska. During the lifetime of O. P. Faulkner, two suits were commenced against him, and a portion of these cattle taken under attachments therein by the sheriff of Richardson county. June 17th, 1872, this action was commenced, in Brown county, Kansas. The cattle were then in Kansas, being in charge of herders employed by Faulkner in his lifetime, and continuing in the employ of the administratrix after his death. They were feeding on the range in day-time, and herded at night at the farm of one Floyd Crandall, in Brown county. The possession of the herders was the possession of the administratrix, except so far as divested by the levy under the attachment. It would seem probable, though the facts are not explicitly found, that at the time of the seizure under the attachments, the death of O. P. Faulkner, and the appointment of his administratrix, the cattle were on the Kansas side of the state line: in other words, the court proceedings were in Nebraska, and the property probably in Kansas. We say probably; for as the cattle were kept very near to the state line, they may in feeding have ranged on both sides of the line, and actually have been in Nebraska at the time of the levy and the appoint-

ment of the administratrix. We may not, however, in the absence of any finding, and in the uncertainty of the testimony, assume positively the fact either way. We must treat it as an unsettled question.

Upon this we remark, that the bill of sale, whether its operation and force are to be determined by the laws of Illinois, where it was executed, or those of Nebraska, where the cattle were at the time of its execution, or those of Kansas, where they were subsequently found, and where the litigation was had, was valid *inter partes*. As between Faulkner, the vendor, and Denny & Redman, the vendees, it conveyed the title to the property, as security for the advances. Had the litigation arisen during the lifetime of Faulkner, and been solely between him and Denny & Redman, the right of possession would have been adjudged in the latter. The difference, judging from the portions of the statutes admitted in evidence, between the laws of Illinois on the one hand, and those of Kansas and Nebraska on the other, in this matter, is, that by the former such a conveyance, unaccompanied by a delivery of possession, or what is deemed an equivalent, registration, would be absolutely void as against creditors and subsequent purchasers, while by the latter, it would be simply *prima facie* void. (Gross's Statutes of Illinois, 3d ed., 1869, ch. 20 — "Chattel Mortgages;" *Mumford v. Canty*, 50 Ill. 370; Revised Statutes of Nebraska, ch. 46 — though see the case of *Pyle v. Warren*, 2 Neb. 241; Gen. Stat. Kansas, ch. 43.)

2. Bill of sale, construed.

We remark secondly, that the administratrix has no greater rights than her intestate. She can claim no more against the bill of sale than could he. It is true, and counsel call our attention to the fact, that the Illinois statute provides that such a conveyance shall be void "as against the rights and interest of any third person or persons." They say that "certainly the administratrix is a third person; she is a trustee holding this property for the benefit of the creditors." We do not so understand that statute. The third person must be one hav-

3. Rights of administratrix under bill of sale.

ing rights and interest other than those of the vendor, and not one who simply holds the same rights and interest. A purchaser is interested to the extent of the money he has paid, a creditor to the amount of his debt. But a mere donee, heir or legatee, or assignee, executor or administratrix, has neither title nor interest other or different from that of the original vendor. As the vendor cannot repudiate the sale, neither can anyone who simply stands in his place. An administrator does not in this respect represent the creditors. He cannot sue, in the absence of express statutory authority, to recover property fraudulently conveyed away by his intestate. (*Crawford's Adm'r v. Lehr*, 20 Kas. 509.) Neither can he defend against a conveyance made by his intestate on the ground that it was void as against creditors. The creditors must protect their own interests. Again, as the laws of a state and the powers and processes of its courts have no extra-territorial force, it follows that the appointment of an administratrix by the probate court, in Nebraska, did not vest in her the property of the decedent, situate in the state of Kansas.

It may not follow that her possession was tortious, but whatever rights she possessed would spring from comity and the laws of this state, and not from the powers given her by the courts of Nebraska. Wherever a decedent leaves property in two states, it is common to have administration in each state — the principal in the state of his domicil, and an ancillary in the other. And a state always has the right to protect home creditors by administration of the decedent's property within its borders. So that if administration had been taken out in Brown county, Kansas, the administrator so appointed would have had the right to the possession of the cattle in that county, as against the administratrix appointed in Nebraska. In Story on the Conflict of Laws, § 512, it is said:

"In regard to the title of executors and administrators, derived from a grant of administration in the country of the domicil of the deceased, it is to be considered that that title cannot *de jure* extend as a matter of right beyond the terri-

tory of the government which grants it and the movable property therein. As to movable property situated in foreign countries, the title, if acknowledged at all, is acknowledged *ex comitate;* and, of course, it is subject to be controlled or modified as every nation may think proper, with reference to its own institutions and its own policy, and the rights of its own subjects. And here the rule to which reference has been so often made applies with great strength, that no nation is under any obligation to enforce foreign laws prejudicial to its own rights or to those of its own subjects. Persons domiciled and dying in one country are often deeply indebted to foreign creditors, living in other countries, where there are personal assets of the deceased. In such cases it would be a great hardship upon such creditors to allow the original executor or administrator to withdraw those funds from the foreign country without the payment of such debts, and thus to leave the creditors to seek their remedy in the domicil of the original executor or administrator, and perhaps there to meet with obstructions and inequalities in the enforcement of their own rights, from the peculiarities of the local law."

But no question arises here between two administrations, or between a foreign administrator and a home creditor. The administratrix appointed in the domicil of the decedent had acquired possession of the property, and it is immaterial whether she had first taken possession in Nebraska and afterward moved the property into Kansas, or had in the first instance taken the possession in Kansas. In the absence of any opposing administration, the courts of this

4. Administration; domicil; jurisdiction.

state, *ex comitate,* will recognize the title and possession of personal property in this state in the administrator appointed in the domicil of the decedent. Payment to such an administrator of a debt due to the decedent will be good. (*Brown v. Brown,* 1 Barb. Ch. 189; *Vroom v. Van Horne,* 10 Paige's Ch. 549; *Parsons v. Lyman,* 20 N. Y. 103.) He may sue or be sued in like manner and under like restrictions as any other non-resident. (Gen. Stat., p. 472, § 203; *Cady's Ex'r v. Bard's Ex'r,* 21 Kas. 667.) The rule is not the same, however, as to the possession of the sheriff. His service of process and seizure of property within this

state would be absolutely void. The laws of Nebraska could give him no power to act in Kansas, and comity does not require any recognition of his powers beyond their territorial limits. Comity is satisfied when it recognizes the validity of his acts done within those limits. No state can ask that its officers be permitted to serve process within the limits of a sister state, and no state can recognize as of any validity the seizure of property within its borders by the officers of another sovereignty acting under process from the courts of that sovereignty. Pointing to her territorial boundaries, "Thus far shalt thou go, and no farther," is the voice of each state to the officers of every other state. A sheriff in seizing property is compelling an unwilling transfer, and the courts of this state can alone compel such a transfer of property within her borders. The adjustment of rights, the settlement of controversies, the forcible transfers of property, must be by the officers of the state, and in obedience to the laws of the state and decrees of its courts. No foreign tribunal can exercise jurisdiction over persons or property within her borders. This is essential to sovereignty; so that if the cattle in controversy were in Kansas at the time of the seizure by the sheriff, such seizure was void, and no title or right of possession passed to him thereby. On the other hand, if the cattle were in Nebraska at the time of the seizure, then his title thereby became good, and will not be divested by the fact that they afterward ranged over the line into Kansas. In other words, whatever title was acquired to the property while in Nebraska, under the laws of Nebraska, will be recognized in this state. The title acquired by a levy will be recognized equally with that acquired by a bill of sale. Generally, one state recognizes titles and rights acquired and vested in another state to property in that state. There may be some conflict and some exceptions to this rule, but so far as the case at bar is concerned, it rests upon the clearest obligations of comity. "Whenever personal property is taken by arrest, attachment or execution within a state, the title so acquired

5. Jurisdiction; void levy of process; valid levy.

7—22 KAS.

under the laws of the state is held valid in every other state."
(Story on Conflict of Laws, § 550.)

It becomes important, therefore, in determining whether
creditors have acquired any valid liens which they may assert
as against the bill of sale, to know whether the levy under
the attachment was actually made in Nebraska or Kansas.
If the former, the sheriff's title must be recognized; if the
latter, it is of no validity.

There is another question which may arise in the future
disposition of this case, which requires notice. As we have
seen, this bill of sale, by the laws of Illinois, Nebraska, and
Kansas alike, was good *inter partes,* but, in the absence of
record and a delivery of possession, was by the laws of the
former state absolutely void as against creditors and subse-
quent purchasers; while by the laws of Nebraska and Kansas,
it would be only *prima facie* void, and might be upheld as
against them by proof of good faith and sufficient considera-
tion. Now the question may arise as to the laws of which
state shall control. It is a general proposition that as to
personal contracts and contracts concerning mov-
able property, the *lex loci contractus* governs. In
other words, whatever goes to the form, manner
of execution, and all other matters affecting the validity of
the instrument as a contract *inter partes,* is settled by the law
of the state where the contract is entered into; and such a
contract, if valid where executed, will be enforced in the
courts of every other state, provided at least the same is not
in conflict with the system of jurisprudence, and does not
contravene the policy of such other state. As said by Mr.
Justice Porter, in *Ohio Insurance Co. v. Edmondson,* 5 La.
295: "By the comity of nations a practice has been adopted
by which the courts of justice examine into and enforce con-
tracts made in other states, and carry them into effect accord-
ing to the laws of the place where the transaction took its rise.
This practice has become so general in modern times that it
may be almost stated to be now a rule of international law,
and it is subject only to the exception that the contract to

6. Comity; lex
loci contractus;
lex fori.

which aid is required should not, either in itself or in the means used to give it effect, work an injury to the inhabitants of the country where it is attempted to be enforced." And in *Scudder v. Union National Bank*, 1 Otto, 406, the court said: "Matters bearing upon the execution, the interpretation, and the validity of a contract, are determined by the law of the place where the contract is made. Matters connected with its ʼ performance are regulated by the law prevailing at the place of performance. Matters respecting the remedy, such as the bringing of suits, admissibility of evidence, statutes of limitation, depend upon the law of the place where the suit is brought." And where a contract is made in one state, and valid by the laws of that state, concerning personal property situated in another state, it may well be that the latter, conceding its validity *inter partes*, shall uphold any of its own laws concerning the effect of that contract upon the rights of third parties domiciled within such state. In pursuance of this, it was early held in this court (*Golden, et al., v. Cockril*, 1 Kas. 259), that a chattel mortgage, executed and recorded in Missouri according to the laws thereof, upon property situated in this state, was invalid as against creditors here. At the time of such execution and record there was no law in force in Kansas providing for the registration of chattel mortgages, and by the common-law delivery was essential to the validity of such a conveyance as against third parties. Now our statutes provide that a chattel mortgage executed by a non-resident upon property within the state, shall be filed in the county where the property is situate. (Gen. Stat., p. 584, § 9.) So that the policy of this state in reference to the protection of creditors and subsequent purchasers, is now plainly expressed in its statutes. We are not advised by anything in the record as to the laws of Nebraska in this respect, and shall not therefore express any opinion thereon. It may also be remarked, that if the claimants under this bill of sale rest their claims upon the laws of the state where they reside, and where the instrument was executed, they would take nothing as against creditors, and they are not prejudiced if

the courts of this state enforce as against them the policy of this state as expressed in its statutes, or the laws of Nebraska, where the property was situate at the time of the execution of the bill of sale.

One further matter we shall notice, and then close this opinion. It appears that the claimants under this bill of sale, after taking possession of the property, shipped it to Chicago, and sold it.. Now the bill of sale having been found to have been only a security, their interest in the property would in no event exceed their advances with interest and cost. Such is certainly the law of Kansas, and such it is believed is the law generally. (See Herman on Chattel Mortgages.) And in determining the remedies under a contract, the *lex fori* governs. Hence, if they had proceeded in good faith under the statute to advertise and sell the property, after taking it into their possession, their liability would not have exceeded the surplus of the proceeds of such sale above their debt, interest and costs. Having made other disposition, their liability must be the excess of the value of the cattle at the time and place of seizure above such debt and interest. Perhaps a claim for such liability could be enforced in this action only by a supplemental answer setting forth the facts of such disposition; but if so, leave should be given to file such answer, that the rights of the parties may be finally adjudicated in this action.

7. Chattel mortgage; duties and liability of mortgagee.

We forbear further remarks upon this case, but because the case was not decided in accordance with the views herein expressed, direct a reversal of the judgment, and a new trial.

All the Justices concurring.